IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO


JUANA HERRERA, et al.,

    Plaintiffs,

    v.                              CIVIL NO. 98-1926 (RLA)

PEDRO TOLEDO DAVILA, et al.,

    Defendants.

═══════════════════════════════════

**ORDER DENYING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**

    Present before the court for disposition are three (3) separate motions for summary judgment filed by the remaining defendants in these proceedings[1] and plaintiffs' omnibus response thereto. The court having reviewed the legal arguments presented by the parties as well as the exhibits submitted hereby finds as follows.

**I.   BACKGROUND**

    This action was instituted by the mother, stepfather and sister of the deceased RAFAEL HERRERA ("HERRERA"). HERRERA, who at the time of his death, was a 27 year old citizen of the Dominican Republic entered Puerto Rico illegally by sea in a small boat in **April 1996.** Plaintiff JUANA HERRERA, on behalf of her deceased son, claims civil rights violations under 42 U.S.C. §§ 1983, 1985 and 1988, the Fourth, Fifth, Eighth, Ninth and Fourteenth Amendments to the U.S.

---

[1]  <u>See</u> Partial Judgment filed on August 10, 1999 dismissing claims asserted against codefendant PEDRO TOLEDO-DAVILA (docket No. 88).

CIVIL NO. 98-1926 (RLA)                                              **Page 2**

Constitution. Additionally, plaintiffs invoke the court's 28 U.S.C. § 1367 supplemental jurisdiction to entertain claims arising under Puerto Rico statutes with respect to pendent parties.

## II.   UNCONTESTED FACTS

The parties agree on the following version of the events leading to the claims charged in the complaint. However, the specific details of the arrest as well as those leading to decedent's death as proffered by plaintiffs are totally at odds with defendants' recount for which reason they appear separately stated in the section that follows. Further, plaintiffs contest the true motive behind the noted "Zero Tolerance" Plan as one exclusively geared at targeting undocumented Dominican nationals.

On **August 16, 1997** the PUERTO RICO POLICE DEPARTMENT ("PRPD") carried out an "operativo" (operation) on bar-type businesses in various sectors of the San Juan metropolitan area as part of what was termed a "Zero Tolerance" Plan.

The interventions were carried out by members of various divisions of the PRPD as well as agents from the PUERTO RICO TREASURY DEPARTMENT.

The highest ranking officer for the "operativo" that night was codefendant Lieutenant JOSE DIAZ PORTALATIN, of the PRPD Special Arrests Unit. The second highest officer present was codefendant Sargent EDUARDO MARTINEZ COLON ("MARTINEZ-COLON") also of the Special Arrests Unit.

**CIVIL NO. 98-1926 (RLA)**                                    **Page 3**

---

According to the PRPD, the purpose of the aforementioned Plan was to intervene with drug selling points, verify that businesses were operating legally, and intervene with criminal activities in general.  The TREASURY DEPARTMENT agents would verify the status of the various licences required for the businesses to legally operate and sell liquor.

The evening of **August 16, 1997** when the personnel assigned to the "operativo" arrived at an establishment known as "El Nuevo Horizonte", decedent RAFAEL HERRERA took flight, running into the local neighborhood and hiding under a car parked on a sidewalk.

Upon instructions from JOSE DIAZ PORTALATIN, codefendants ORLANDO ORTIZ and ROBERT GARCIA-PEREZ followed decedent.  Decedent was arrested and eventually placed in a van together with other illegal aliens previously detained that evening.

After decedent was placed in the van the "operativo" continued through other parts of the San Juan metropolitan area.

Upon conclusion of the "operativo" the van was driven to the airport in order to deliver the detainees to the U.S. Immigration Services ("INS").  Due to the late hour there were no INS agents available to take the detainees into custody.  Hence, the detainees were taken to the Puerto Nuevo Police Station for an overnight stay.

When the other detainees got out of the van upon arrival at the Puerto Nuevo Police Station the officers noticed that decedent was not moving.

1  **CIVIL NO. 98-1926 (RLA)**                                    **Page 4**

2  ────────────────────────────────────────────────────────────

3      Codefendant JOSE DIAZ-PORTALATIN gave orders to take decedent to

4  the nearest hospital.  Decedent was pronounced dead at approximately

5  2:00 a.m. upon arrival at the Emergency room of the Rio Piedras

6  Medical Center.

7      According to the autopsy performed by DR. YOCASTA BRUGAL, of the

8  P.R. FORENSIC MEDICINE INSTITUTE, HERRERA died of natural causes,

9  i.e., due to a sickle cell anemia crisis.

10     An internal investigation carried out by the SPECIAL

11 INVESTIGATION BUREAU of the P.R. DEPARTMENT OF JUSTICE concluded that

12 there was no evidence to support plaintiffs' allegations in the

13 complaint.

14     The PRPD conducted an investigation and also concluded there had

15 been no wrongdoing on the part of the government officers.

16              **III.   PLAINTIFFS' VERSION OF THE EVENTS**

17     The following constitute plaintiffs' version of the events which

18 transpired on the evening of **August 16, 1997** which facts are duly

19 supported by the evidence attached to their opposition to defendants'

20 summary judgment requests.

21     The Zero Tolerance Plan in effect on **August 16, 1997** targeted

22 commercial establishments where Dominican nationals routinely

23 gathered.

24     The only individuals arrested as part of the Zero Tolerance Plan

25 were Dominicans residing illegally in Puerto Rico.

26

**CIVIL NO. 98-1926 (RLA)**                                      **Page 5**

The true objective of the Zero Tolerance Plan was to round up undocumented Dominican nationals and deliver them to federal immigration authorities for deportation.

The TREASURY agents present during the "operativo" were used as a pretext to justify entry into commercial establishments where Dominican nationals were known to gather.

The TREASURY DEPARTMENT has regulatory power with respect to the sale of alcoholic beverages and business volume "patentes".

**On August 16, 1997,** prior to decedent's arrest, several Dominican nationals had been rounded up by police officers and asked to produce their immigration documentation.  Because they could not produce them, they were placed in the van driven by codefendant MIGUEL GUADALUPE-PARRILLA  for eventual deportation.

The police intervened with these individuals strictly on the basis of their physical appearance and presence in neighborhoods where Dominican nationals were known to gather.

When decedent ran off the evening of **August 16, 1007** he was chased by codefendants ORLANDO ORTIZ and ROBERT GARCIA PEREZ, one on foot and the other by car upon instructions of codefendant DIAZ PORTALATIN.  Two gunshots were fired into the air.

Upon spotting decedent hiding under a car, codefendants ORLANDO ORTIZ and ROBERT GARCIA PEREZ dragged decedent out, handcuffed him and subjected him to a brutal beating witnessed by a local resident.

**CIVIL NO. 98-1926 (RLA)**                                    **Page 6**

Decedent was pushed and forced to walk back to the area where he had been first seen near "El Nuevo Horizonte" Bar. This was observed by MARTINEZ-COLON who failed to intervene despite decedent's obvious distress.

As they were approaching the area ORLANDO ORTIZ and ROBERT GARCIA PEREZ again beat decedent smashing his head against an iron gate in front of a local residence. This incident was also witnessed by a local resident. Meanwhile, decedent kept pleading with the officers to stop beating him.

Thereafter, decedent was placed inside a police vehicle identified as an Isuzu Trooper purportedly for an additional beating. The vehicle took off with decedent as well as codefendants ORLANDO ORTIZ and ROBERT GARCIA PEREZ. Supervisory officers codefendants EDUARDO MARTINEZ-COLON and JOSE DIAZ-PORTALATIN did nothing to prevent the additional beating.

Subsequently, decedent was brought back to the white Ford van where the other Dominican nationals were being held. According to a witness codefendant MIGUEL GUADALUPE-PARRRILLA threw decedent inside the van. As a result thereof decedent hit the window frame with the left side of his head and his body landed half on the vehicle's seat and half on the floor.

Eventually HERRERA lost consciousness and was seen to be foaming at the mouth by other passengers in the van. The detainees expressed their concern regarding decedent's condition to the

**CIVIL NO. 98-1926 (RLA)**                                          **Page 7**

officers riding in the van, including codefendant MIGUEL A. GUADALUPE to no avail. The police officers paid no attention to the passenger's concerns regarding decedent's condition by responding that he was drunk.

The officers continued with the "operativo" moving on to other locations and rounding up illegal aliens while decedent remained in the van.

At some point the detainees requested that their handcuffs be changed from their backs to the front.  Codefendant JOSE DIAZ-PORTALATIN agreed and all were changed except for HERRERA. Codefendant DIAZ-PORTALATIN did nothing to ascertain what was wrong with decedent.

After approximately one hour the van was driven to the airport for handing over the detainees to the INS.  Upon arrival all detainees except for decedent disembarked to use the restroom.  None of the officers checked upon decedent at that time.

The other detainees were placed in the van once again because there was no one available at INS at the airport to accept them at that late hour.  By then more than three hours had passed since the initial intervention with the decedent.

The other detainees alerted the officers to the fact that HERRERA was cold and they feared he might have died.  The officers disregarded this comment and blamed his temperature instead on the air conditioning system.

It was not until arrival at the Puerto Nuevo Police Station when all other passengers descended from the van that the police officers took note of decedent's condition.

DR. IRA MEHLMAN, a specialist in trauma medicine with extensive experience with sickle cell anemia, and who was retained by plaintiffs in this case concluded that HERRERA died as a result of severe trauma to his head. Further, DR. MEHLMAN disputes DR. BRUGAL's conclusion concerning the role of sickle cell disease in HERRERA's demise. According to DR. MEHLMAN decedent did not suffer from sickle cell anemia but rather had a sickle cell trait, which poses no significant effect on an individual's health and could not have been the cause of HERRERA's death.

### IV. SUMMARY JUDGMENT STANDARD

Rule 56(c) Fed. R. Civ. P., which sets forth the standard for ruling on summary judgment motions, in pertinent part provides that they shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Sands v. Ridefilm Corp., 212 F.3d 657, 660-61 (1st Cir. 2000); Barreto-Rivera v. Medina-Vargas, 168 F.3d 42, 45 (1st Cir. 1999). The party seeking summary judgment must first demonstrate the absence of a genuine issue of material fact in the record. DeNovellis v. Shalala, 124 F.3d 298, 306 (1st Cir. 1997). A genuine

CIVIL NO. 98-1926 (RLA)    Page 9

issue exists if there is sufficient evidence supporting the claimed factual disputes to require a trial. Morris v. Gov't Dev. Bank of Puerto Rico, 27 F.3d 746, 748 (1st Cir. 1994); LeBlanc v. Great Am. Ins. Co., 6 F.3d 836, 841 (1st Cir. 1993), cert. denied, 511 U.S. 1018, 114 S.Ct. 1398, 128 L.Ed.2d 72 (1994). A fact is material if it might affect the outcome of a lawsuit under the governing law. Morrissey v. Boston Five Cents Sav. Bank, 54 F. 3d 27, 31 (1st Cir. 1995).

In cases where the non-movant party bears the ultimate burden of proof, he must present definite and competent evidence to rebut a motion for summary judgment, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256-257, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); Navarro v. Pfizer Corp., 261 F.3d 90, 94 (1st Cir. 2000); Grant's Dairy v. Comm'r of Maine Dep't of Agric., 232 F.3d 8, 14 (1st Cir. 2000), and cannot rely upon "conclusory allegations, improbable inferences, and unsupported speculation". Lopez v. Rubianes, 230 F.3d 409, 412 (1st Cir. 2000); Maldonado-Denis v. Castillo-Rodríguez, 23 F.3d 576, 581 (1st Cir. 1994); Medina-Muñoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990).

V.    STANDING IN A § 1983 ACTION

Defendants allege plaintiffs have no standing to assert a § 1983 claim because they were not personally deprived of any protected right. However, plaintiffs have clarified that they are not personally seeking relief under this provision. Rather, it is only

CIVIL NO. 98-1926 (RLA)                                    **Page 10**

plaintiff JUANA HERRERA that is asserting the § 1983 claims on behalf of her deceased son.

Thus, the relief sought by defendants under this argument is **DENIED.**

## VI.   § 1983 ELEMENTS

The complaint charges violation of 42 U.S.C. § 1983 which reads:

> Every person who, under color of any statute, ordinance, regulation, custom or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proceeding for redress.

Section 1983 does not create substantive rights but is rather a procedural mechanism for enforcing constitutional or statutory rights. Albright v. Oliver, 510 U.S. 266, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994). Hence, it is plaintiffs' burden to identify the particular underlying constitutional or statutory right that is sought to be enforced via judicial proceedings.

In order to prevail in a § 1983 claim plaintiff must bring forth evidence that (1) defendant acted "under color of state law" and (2) deprivation of a federally protected right. Rogan v. City of Boston, 267 F.3d 24 (1st Cir. 2001); Dimarco-Zapa v. Cabanillas, 238 F.3d 25,

1  CIVIL NO. 98-1926 (RLA)                                        Page 11

2  ────────────────────────────────────────────────────────────

3  33 (1ˢᵗ Cir. 2001); Collins v. Nuzzo, 244 F.3d 246 (1ˢᵗ Cir. 2001);

4  Barreto-Rivera, 168 F.3d at 45.

5      All parties concede that the defendants were acting within the

6  scope of their duties as state officers at all relevant times.

7  Therefore, the first element is satisfied.  We must then ascertain

8  whether decedent was deprived of any federally protected right as a

9  result of the events on the night of his demise.

                       A.  Excessive Use of Force

10
11     HERRERA has identified a colorable claim for use of excessive

12 force duly protected by the Fourth Amendment and hence actionable via

13 § 1983.  Claims for alleged use of excessive force during the course

14 of an arrest are tested under the provisions of the Fourth Amendment

15 which guarantees "[t]he right of the people to be secure in their

16 persons... against unreasonable... seizures".  Graham v. Connor, 490

17 U.S. 386, 394, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989); Jarrett v.

18 Town of Yarmouth, 331 F.3d 140, 148 (1ˢᵗ Cir. 2003); Bastien v.

19 Goddard, 279 F.3d 10, 14 (1ˢᵗ Cir. 2002); Gaudreault v. Municipality

20 of Salem, 923 F.2d 203, 205 (1ˢᵗ Cir. 1990).  On the other hand,

21 "[c]laims of excessive force by a police officer arising outside the

22 context of a seizure, and thus outside the Fourth Amendment, are

23 analyzed under substantive due process principles."  Cummings v.

24 McIntire, 271 F.3d 341, 344 (1ˢᵗ Cir. 2001).

25     Application of force by police officers during the course of an

26 arrest exceeding that which is reasonably necessary under the extant

CIVIL NO. 98-1926 (RLA)                                      Page 12

circumstances is actionable under § 1983.  However, the determination of what is "reasonable" is a fact specific inquiry which will be determined by balancing the individual interests protected by the Fourth Amendment versus the public interest at stake.  Hence, the fact-finder will need to pay "careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Jarret, 331 F.3d at 148 (citing Graham, 490 U.S. at 394); Bastien, 279 F.3d at 14. An unprovoked assault is actionable under § 1983 inasmuch as an attack with "no justification, and no motive but punishment... would constitute the use of 'excessive force.'" Gaudreault, 923 F.2d at 207.

Thus, even assuming that the initial intervention with decedent may have been justified the question remains as to whether the degree of force actually used both at the time HERRERA was initially restrained and during the period he was held in custody was greater than was reasonably necessary.  Once an individual is apprehended there is no longer a need for use of force if the suspect is handcuffed and unable to escape.  Beating and kicking arrestees while in the control of the police is clearly excessive force.

The severity of injuries resulting from police intervention may be considered in ascertaining the reasonableness of the degree of

CIVIL NO. 98-1926 (RLA)                                          **Page 13**

---

force used. <u>Bastien</u>, 79 F.3d at 14.  In situations where the arrestee was not forcibly resisting the officers, serious and substantial injuries may support an inference of excessive use of force. <u>Santos v. Gates</u>, 287 F.3d 846 (9th Cir. 2002).

Further, only when "no genuine dispute exists as to the 'objective reasonableness' of the force employed by the police" may summary judgment be granted in defendant's favor. <u>Gaudreault</u>, 923 F.2d at 205.

### 1) Excessive Use of Force and Qualified Immunity

The reasonableness of force used during an arrest "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.  Because objective reasonableness is the touchstone of the excessive force inquiry, the constitutional and qualified immunity inquiries in this area are closely intertwined." <u>Jarrett</u>, 331 F.3d at 148 (citation and internal quotation marks omitted). The qualified immunity inquiry in Fourth Amendment unreasonable cases is the same as the inquiry into the underlying claims.

In theory, substantive liability and qualified immunity are two separate questions and, indeed, may be subject to somewhat different procedural treatment.  In police misconduct cases, however, the Supreme Court has used the same 'objectively reasonable' standard in describing both the constitutional test of liability and

CIVIL NO. 98-1926 (RLA)                                           **Page 14**

the Court's own standard for qualified immunity. [It seems

unlikely that this case would deserve a different outcome

even if the qualified immunity defense had not been raised.

Roy v. Inhabitants of City of Lewiston, 42 F.3d 691, 695 (1st Cir.

1994) (internal citations omitted).

## 2) Supervisory Liability

The doctrine of *respondeat superior*, whereby liability is

imposed on employers for the acts or omissions of their employees is

inapposite in actions brought under § 1983. Supervisors will be held

accountable under this provision solely "on the basis of [their] own

acts or omissions". Barreto-Rivera, 168 F.3d at 48; Diaz v.

Martinez, 112 F.3d 1, 4 (1st Cir. 1997); Maldonado-Denis v. Castillo-

Rodriguez, 23 F.3d 576, 581 (1st Cir. 1994); Gutierrez-Rodriguez v.

Cartagena, 882 F.2d 553, 562 (1st Cir. 1989). Rather, "[s]uch

liability can arise out of participation in a custom that leads to a

violation of constitutional rights, or by acting with deliberate

indifference to the constitutional rights of others." Diaz v.

Martinez, 112 F.3d at 4 (citations omitted).

Further, for plaintiff to prevail he must bring evidence of a

casual connection or relationship between the alleged misconduct and

the supervisor's acts or omissions. "A supervisory officer may be

held liable for the behavior of his subordinate officers where his

action or inaction [is] affirmative[ly] link[ed]... to that behavior

in the sense that it could be characterized as supervisory

**CIVIL NO. 98-1926 (RLA)**                                        **Page 15**

encouragement, condonation or acquiescence or gross negligence amounting to deliberate indifference." <u>Wilson</u>, 294 F.3d at 6 (citations and internal quotations omitted); <u>Figueroa-Torres v. Toledo-Davila</u>, 232 F.3d 270, 279 (1st Cir. 2000); <u>Barreto-Rivera</u>, 168 F.3d at 48;

<u>Maldonado-Denis</u>, 23 F.3d at 582; <u>Gutierrez-Rodriguez</u>, 882 F.2d at 562

### 3) Failure to Intervene

Supervisors present when constitutional violations take place "are liable if they participate in the wrong or watch what is occurring and fail to intercede." 1 Vincent R. Fontana, Municipal Liability Law and Practice § 8.7 pp. 281-2 (footnotes omitted) (John Wiley & Sons, Inc. 2nd Ed. 1996). "A superior officer will be held liable if he is actually present on the scene and either participates in the violation or fails to prevent the violation if he has a chance to do so." 1 Isidore Silver, Police Civil Liability § 8.07[1] p. 8-112 (LexisNexis Matthew Bender 2002).

The clearest cases of supervisory liability are where the supervisors are present at the scene of police activity and fail to prevent unconstitutional acts by their subordinates. Any police officer may be held liable for the failure to prevent another officer from violating plaintiff's rights if he is present and could have prevented the violation. In the case of supervisory officers, the duty to intervene and to exercise appropriate

1  CIVIL NO. 98-1926 (RLA)                              Page 16

2  ─────────────────────────────────────────────────────────

3  command functions is greater.  The failure to do so is an

   appropriate basis for liability.

4
   Michael Avery, David Rudovsky and Karen M. Blum, Police Misconduct

5  Law and Litigation § 4.8 p. 4-14 (footnote omitted) (Thompson-West 3rd

6  ed. 1996)

7      The duty to prevent or assist unwarranted use of force by a law

8  enforcement individual applies not only to his superiors but also to

9  fellow officers.  "An officer may be liable not only for his personal

10 use of excessive force, but also for his failure to intervene in

11 appropriate circumstances to protect an arrestee from the excessive

12 use of force by his fellow officers."  Wilson v. Town of Mendon, 294

13 F.3d 1, 6 (1st Cir. 2002);  Gaudreault, 923 F.2d at 207 n.3 ("An

14 officer who is present at the scene and who fails to take reasonable

15 steps to protect the victim of another officer's use of excessive

16 force can be held liable under section 1983 for his nonfeasance.")

17    B.  **Deliberate Indifference to Serious Medical Needs**

18     Plaintiffs concede that Eighth Amendment protection extends only

19 to convicted individuals and have therefore withdrawn references to

20 this particular constitutional provision.  However, denial of

21 adequate medical attention to persons either detained and/or arrested

22 also merits constitutional protection.

23     The refusal to provide or the excessive delay in providing a

24 post-arrest detainee with needed medical attention may give rise to

25 a constitutional violation actionable under § 1983 on due process

26

1    **CIVIL NO. 98-1926 (RLA)**                                    **Page 17**

2    ――――――――――――――――――――――――――――――――――――――――――――

3    grounds.  Government authorities are required to provide medical care

4    to those injured by police while being apprehended.   Further, even

5    though this duty arises under due process principles the courts have

6    adopted the standards developed under the Eighth Amendment applicable

7    to convicted prisoners.

8        "The rights implicated here [lack of medical care] are the due

9    process protections afforded a pre-trial detainee under the

10   Fourteenth Amendment" Gaudreault, 923 F.2d at 208; Ferris v. County

11   of Kennebec, 44 F.Supp.2d 62, 67 n.2;  Jesionowski v. Beck, 937

12   F.Supp. 95, 101 (D. Mass. 1996).  "The boundaries of this duty have

13   not been plotted exactly; however, it is clear that they extend at

14   least as far as the protection that the Eighth Amendment gives to a

15   convicted prisoner." Gaudreault, 923 F.2d at 208.

16       The applicable standard for determining whether the conduct at

17   issue rises to a constitutional deprivation level is whether the

18   defendants "acted with deliberate indifference ... to [decedent's]

19   serious medical needs." Estelle v. Gamble, 429 U.S. 97, 106, 97

20   S.Ct. 285, 50 L.Ed.2d 251 (1976); Gaudreault, 923 F.2d at 208;

21   Ferris, 44 F.Supp.2d at 66-7; Jesionowski 937 F.Supp. at 101

22       "A medical need is 'serious' if it is... one that is so obvious

23   that even a lay person would easily recognize the necessity for a

24   doctor's attention." Gaudreault, 923 F.2d at 208; Ferris, 44

25   F.Supp.2d at 67; Jesionowski, 937 F.Supp. at 101. Further, "[a]bsent

26   evidence of subjective awareness, there could not no 'deliberate

CIVIL NO. 98-1926 (RLA)                                    Page 18

indifference' to [plaintiff's] serious medical need." Mahan v. Plymouth County House of Corrections, 64 F.3d 14, 18 (1st Cir. 1995).

"The 'seriousness' of an [arrestee's] needs may also be determined by reference to the effect of the delay of treatment." Gaudreault, 923 F.2d at 208.

In the process of evaluating a summary judgment petition the court will evaluate whether the arrestee "display[ed] any 'serious medical needs' during the hours following his arrest." Id.

## 1) Qualified Immunity and Indifference to Medical Needs

Qualified immunity shields officials from having to pay for damages resulting from violations of § 1983 provided "their conduct does not violate clearly established statutory authority or constitutional rights of which a reasonable person would have known." Dimarco-Zappa v. Cabanillas, 238 F.3d 25, 35 (1st Cir. 2001) (citations and internal quotations omitted); Diaz v. Martinez, 112 F.3d at 3. "For purposes of this defense, a right is clearly established if the 'contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" Id. (citing Anderson v. Creighton, 483 U.S. 635, 640, 107 S.Ct. 3034, 1039, 97 L.Ed.2d 523 (1987)).

Because qualified immunity is an affirmative defense it is defendant's burden to present evidence of its applicability. Dimarco-Zappa, 238 F.3d at 35.

CIVIL NO. 98-1926 (RLA)                                      **Page 19**

Defendants do not contend that deliberate indifference to an arrestee's medical needs was not a clearly established constitutional protection in **August 1997**.   Rather, their qualified immunity arguments rest on the purported lack of evidence of conduct which would rise to the level of a § 1983 violation.

## VII.   § 1985 & EQUAL PROTECTION

Section 1985(3) proscribes conspiracies to deprive persons of their constitutional rights.   "To state a claim under § 1985(3) a plaintiff must allege the existence of (1) a conspiracy, (2) a conspiratorial purpose to deprive a person or class of persons, directly or indirectly, of the equal protection of the laws or equal privileges and immunities under the laws, (3) an overt act in furtherance of the conspiracy, and (4) either (a) an injury to person or property, or (b) a deprivation of a constitutionally protected right or privilege." Aulson v. Blanchard, 83 F.3d 1, 3 (1st Cir. 1996).

Equal protection within the aforementioned provision specifically denotes conduct motivated by "some racial, or ... otherwise class-based, invidiously discriminatory animus". Griffin v. Breckenridge, 403 U.S. 88, 102, 91 S.Ct. 1790, 1798, 29 L.Ed.2d 338 (1971); Aulson, 83 F.3d at 3 ("conspiratorial conduct... [must be] propelled by ...'invidiously discriminatory animus'") (citing Griffin); Donahue v. City of Boston, 304 F.3d 110, 122 (1st Cir. 2002) (in order to prevail plaintiffs must present evidence that "(1) some

1   **CIVIL NO. 98-1926 (RLA)**                                    **Page 20**

2   —————————————————————————————————————————————————————————

3   class-based animus (usually racial) lay behind the conspirators'

4   action, and (2) that the conspiracy was aimed at interfering with

5   protected rights."); Burns v. State Police Assoc. of Mass., 230 F.3d

6   8, 12 (1st Cir. 2000).

7       In order to establish racial discriminatory animus in this case

8   in contravention of his equal protection guarantees plaintiffs must

9   present evidence to prove that decedent, as an illegal alien from the

10  Dominican Republic, was intentionally treated by defendants

11  differently from other similarly situated illegal aliens and that no

12  reasonable justification existed for the difference in treatment.

13  Village of Willowbrook v. Olech, 528 U.S. 1073, ___ , 120 S.Ct. 1073,

14  1074, 145 L.Ed.2d 1060 (2000); Burns v. State Police Assoc. of Mass.,

15  230 F.3d at 12 n.4.

16      Plaintiffs have proffered sufficient documentary evidence in

17  support of the allegation that the "operativo" specifically targeted

18  Dominican nationals to withstand defendants' summary judgment

19  request. According to the record before us, these individuals were

20  detained based solely on their national alienage and turned over to

21  federal authorities with exclusive deportation authority. Those

22  rounded up as part of the "Zero Tolerance" initiative had not

23  committed any crime nor were they charged with any criminal offense.

24  Their detention was motivated exclusively by their national origin.

25      Further, the purported harsh treatment decedent received during

26  the course of his arrest, and the subsequent failure to provide

CIVIL NO. 98-1926 (RLA)                                          **Page 21**

medical care as alleged also raise an inference of discriminatory animus when examined within the context of the evidence submitted by plaintiffs in this action.

Thus, we conclude that there is sufficient evidence before us to conclude that the named defendants acted in common and mutual concert to deprive decedent of the equal protection of the law based on national origin.

### VIII. NINTH AMENDMENT

Plaintiffs do not object to the dismissal of references to the Ninth Amendment in the complaint as superfluous inasmuch as violations under the Fourth Amendment and Due Process provisions have been adequately pled. Plaintiffs' Omnibus Opposition... (docket No. 199) p. 40. Accordingly references in the complaint to the Ninth Amendment are hereby **STRICKEN**.

### IX.   SUPPLEMENTAL JURISDICTION

Plaintiffs having asserted valid claims as to which there is original federal jurisdiction defendants' request that these be dismissed is **DENIED**. The court will entertain all related local causes of action asserted by plaintiffs as provided for in 28 U.S.C. § 1367.

### X.   THE MOTIONS

### A.   Codefendants EDUARDO MARTINEZ-COLON & ORLANDO ORTIZ

EDUARDO MARTINEZ-COLON denies having supervisory functions during the "operativo" carried out on August 16, 1997 and also

1  **CIVIL NO. 98-1926 (RLA)**                                    **Page 22**

2  ────────────────────────────────────────────────────────

3  disclaims any personal involvement in the events charged in the

4  complaint.  According to the facts proffered by Officer MARTINEZ-

5  COLON his role that evening was to pose as a decoy in the

6  establishments targeted for intervention and safeguard the back

7  entrance.  MARTINEZ-COLON further avers that his only contact with

8  HERRERA the evening of **August 16, 1997** was when decedent was brought

9  back after being arrested and did not ride in the van where the

10  detainees were transported. Specifically, he argues that "he is not

11  liable under section 1983 since he personally did not participate in

12  any of the alleged acts for which plaintiffs are suing."  Brief...

13  (docket No. 174) p. 11.

14      However, according to the evidence submitted by plaintiffs

15  codefendant was present and failed to intervene when decedent was

16  brought back in obvious distress after his arrest as well as when

17  ORTIZ placed HERRERA in a Trooper for an undisclosed purpose and  for

18  an undetermined period of time.

19      Regarding his denial of supervisory status that evening,

20  codefendant ORTIZ identified MARTINEZ-COLON as his immediate

21  supervisor on the night of the events.

22      Police officer ORLANDO ORTIZ denies the allegations of excessive

23  use of force and claims that decedent's detention and arrest were in

24  conformity with the Fourth Amendment's "reasonableness" standard.

25  The officer relates decedent's suspicious behavior which prompted

26  DIAZ PORTALATIN to give orders for his apprehension, the ensuing

CIVIL NO. 98-1926 (RLA)                                                     Page 23

chase, eventual arrest and walking back to the van all carried out in conformity with the applicable standards.

However, plaintiffs have submitted statements of area residents which directly contradict the manner in which ORTIZ handled the arrest and what transpired from the time HERRERA was initially taken into custody until he was placed in the van. These neighbors claim to have witnessed decedent (1) being dragged from beneath the vehicle where he was hiding, (2) beaten on at least two separate occasions, and (3) placed in a Trooper for an unaccounted purpose and for an indefinite period of time prior to delivering him to the van.

Codefendants MARTINEZ-COLON and ORTIZ raise the defense of qualified immunity arguing that plaintiffs' claims against them "do not constitute a violation of a federal civil right." Brief... (docket No. 174) p. 23. Specifically, they contend that "[p]laintiffs have not identified nor provided solid evidence of a single act of defendant Martinez-Colón that demonstrates that he failed to provide adequate medical care [or that] defendant Ortiz... used excessive force during the detention of Rafael Herrera". Petitioners argue that there could have been no beating and *ergo* no lack of needed medical attention since HERRERA died of natural causes as a result of a sickle cell anemia crisis.

Plaintiffs have met their burden of presenting sufficient evidence to raise an issue of fact regarding the "reasonableness" of the conduct of both MARTINEZ-COLON and ORTIZ. There is testimony

1  **CIVIL NO. 98-1926 (RLA)**                                      **Page 24**

2  ────────────────────────────────────────────────────────────

from witnesses to the events when they saw decedent being hit, pushed
3
and shoved, heard him screaming begging not to be beaten and
4
notifying the arresting officers that he simply had no documents.
5
As previously indicated, in excessive use of force actions the
6
evidence for the underlying § 1983 claim is the same as that relied
7
upon for ruling on the applicability of qualified immunity. Because
8
determination of liability based on the use of excessive force and
9
availability of qualified immunity in this particular case are
10
premised on the same facts, it is a factual inquiry that needs to be
11
presented to the jury.
12
Factual disputes also preclude granting qualified immunity
13
regarding the claim for failure to provide medical care. Plaintiffs
14
have adequately challenged petitioners' argument that HERRERA's
15
demise did not come as a result of a beating and hence no claim for
16
disregarding his medical needs is viable. The opinion proffered by
17
DR. MEHLMAN, plaintiffs' medical expert directly contradicts that of
18
the local forensic expert used by defendants in support of this
19
theory. DR. MEHLMAN not only rejected the hypothesis that death
20
resulted from a sickle cell anemia crisis but further opined that
21
HERRERA died of a "closed-head trauma" which caused probable seizure
22
and coma.
23
                   **B.  Codefendant ROBERT GARCIA**
24
GARCIA, a Treasury agent, denies having used any force against
25
decedent or violating in any way decedent's constitutional rights.
26

CIVIL NO. 98-1926 (RLA)                                                    **Page 25**

Codefendant claims his role was limited to providing support to ORTIZ, the police officer who detained HERRERA.

This version runs contrary to neighborhood residents who declared having seen GARCIA beating HERRERA along with police officer ORTIZ on at least two separate occasions. Further, plaintiffs have submitted evidence pointing to GARCIA, joined by ORTIZ, placing decedent in an Isuzu Trooper prior to taking him to the white Ford van purportedly for an additional beating.

Given the disputed material facts regarding GARCIA's role the evening of **August 16, 1997** summary judgment in his favor is not proper at this juncture.

C. **Codefendants MIGUEL GUADALUPE & JOSE DIAZ PORTALATIN**

Codefendant MIGUEL GUADALUPE was assigned to drive the white Ford van during the "operativo" on **August 16, 1997**. He denies any wrongdoing and asserts his only intervention regarding decedent was to "frisk" him prior to boarding the van and asking HERRERA "if he was all right, which was answered in the affirmative." Memorandum of Law... (docket No. 197) p. 9. Codefendant further claims that at no time did decedent complain of having been hit nor did he appear to have been beaten.

However, witnesses on scene describe how GUADALUPE violently threw decedent into the van, causing him to bang his head against the window frame severely injuring him and how  HERRERA landed halfway on the floor and seat. Further, during the entire time codefendant

CIVIL NO. 98-1926 (RLA)                                    **Page 26**

was driving the van he ignored obvious signs which denoted a condition which warranted prompt medical attention including specific comments from the passengers.

Again, the crucial facts regarding the acts and/or omissions of codefendant during the "operativo" the night in question remain unsettled based on the evidence adduced by plaintiffs and must therefore be elucidated at trial.

Codefendant JOSE DIAZ PORTALATIN concedes that on **August 16, 1997** he was in charge of the Special Arrests Unit of the PRPD and responsible for implementing and carrying out an "operativo" as part of the "Zero Tolerance Plan". That the "operativo" was to be carried out by agents from the Special Arrests Unit, the Criminal Investigations Corps of San Juan, the Canine Unit and the Treasury Department. Officer DIAZ PORTALATIN further acknowledges that upon noticing decedent hastily leave the "El Nuevo Horizonte" bar he gave instructions to chase him and that ORTIZ and GARCIA took off after HERRERA and eventually brought him back under arrest. That after conclusion of the "operativo" that night the detainees were taken to the airport to be turned over to INS but because there was no one available to take them into custody they had to be taken instead to the Puerto Nuevo police station. That it was not until they reached the police station that he was first alerted to the fact that there was something wrong with HERRERA for which reason he ordered that decedent be taken to the nearest hospital.

1 **CIVIL NO. 98-1926 (RLA)**                                    **Page 27**

2 ───────────────────────────────────────────────────────────

3      Petitioner denies personal participation in any deprivation of

4 decedent's rights and rejects claims of having disregarded decedent's

serious medical needs.

5

6      Plaintiffs on the other hand have presented evidence which, if

credible, places DIAZ PORTALATIN at the scene and being personally

7

involved in the events leading to HERRERA's death either by failing

8

to take action to stop violations committed in his presence and/or

9

through deliberate indifference to decedent's obvious need of medical

10

attention.

11

12      Even though DIAZ PORTALATIN rejects plaintiffs' description of

decedent's physical condition after he was taken into custody,

13

codefendant acknowledged that he was present when decedent was

14

brought back after his arrest and inquired if decedent was feeling

15

well because "they were breathing heavily from the run [and that]

16

Rafael Herrera said that he was tired.  Immediately after, Rafael

17

Herrera was helped into the van."  Brief... (docket No. 174) p. 17.

18

(footnotes omitted).

19

20      Codefendant also had contact with the detainees in the van at

different points in time throughout the evening until they eventually

21

arrived at the Puerto Nuevo police station and at no time took action

22

to address decedent's obvious need for medical attention.  Again,

23

issues of material fact preclude summary judgment as requested.

24

25      DIAZ-PORTALATIN states that he was not the supervisor of either

GUADALUPE nor GARCIA on **August 16-7, 1997** and thus, not liable for

26

CIVIL NO. 98-1926 (RLA)                                    Page 28

their acts or omissions.  Further, that even though he was the

supervisor of codefendants MARTINEZ-COLON and ORTIZ on that evening

there is no supervisory liability for their conduct because he was

not put on notice of behavior likely to result in a civil rights

deprivation.

The fact that codefendant's underlings had no prior records of

wrongdoing is irrelevant to the aforementioned claims as articulated

by plaintiffs.

    GUADALUPE and DIAZ-PORTALATIN argue they are entitled to

qualified immunity defense based on the alleged absence of factual

underpinnings for a constitutional violation on their part.

Specifically, they contend:

        Defendant Diaz is shielded by the qualified immunity

        defense because as supervisor in the instant case, he was

        very aware of the applicable law at the time the alleged

        acts took place.  Furthermore, both defendant Diaz and

        Guadalupe had no personal involvement in the alleged

        violation[s]... that lead to the complaint, and the

        established policies did not in any way violate plaintiffs'

        rights in a reckless and or deliberate indifference

        manner...

        Defendants are also entitled to qualified immunity

        because they acted according to the law, in good faith and

        within the scope of their duties as officers of the Police

CIVIL NO. 98-1926 (RLA)                                      **Page 29**

Department.  In fact, their conduct at all times was well

within the scope of their duties.

Memorandum of Law... (docket No. 197) pp. 19-20.

    In sum, they disclaim any personal involvement in the alleged

constitutional breach.  However, plaintiffs' version of codefendants'

acts and/or omissions vis à vis decedent as previously described

raise a factual controversy of the kind and degree that preclude

summary judgment.

## XI.   INTERLOCUTORY APPEAL

    Plaintiffs argue that defendants have raised the qualified

immunity defense as a subterfuge for further delaying the proceedings

by means of an immediate appeal.   The interlocutory denial of a

qualified immunity defense request may be immediately appealable if

the court's decision "is based on a purely legal ground, such as a

finding that the conduct described by the plaintiff, assuming it

occurred, transgressed a clearly established right."   Diaz v.

Martinez, 112 F.3d at 3.  However, denials of a qualified immunity

defense based on issues of fact necessitate the entry of a final

judgment as a pre-requisite for appellate review.   Id.

    In this particular case plaintiffs have documented a series of

events which, if found believable at trial, would constitute

deprivation of rights safeguarded by § 1983 by each one of the named

defendants and which also preclude qualified immunity.  Thus, appeal

1  **CIVIL NO. 98-1926 (RLA)**                                      **Page 30**

2  ────────────────────────────────────────────────────────────────

at this time would be inappropriate under clear First Circuit
3
precedent.
4
                         **XII.    CONCLUSION**
5
     Based on the foregoing, defendants' motions for summary judgment[2]
6
are hereby **DENIED**.
7
     IT IS SO ORDERED.
8
     San Juan, Puerto Rico, this 17th day of July, 2003.
9

10

11                                    ─────────────────────────
                                       RAYMOND L. ACOSTA
12                                    United States District Judge

13

14

15

16

17

18

19

20

21

22  ──────────────

     [2]  <u>See</u> Brief in Support of Motion for Summary Judgment of
23  Defendants EDUARDO MARTINEZ-COLON and ORLANDO ORTIZ-FERNANDEZ (docket
    No. **174**); Brief in Support of Motion for Partial Summary Judgment of
24  Defendant ROBERT GARCIA-PEREZ (docket No. **196**); Memorandum of Law in
    Support of Motion for Summary Judgment, filed by defendants MIGUEL
25  GUADALUPE-PARRILLA and JOSE DIAZ-PORTALATIN (docket No. **197**);
    Plaintiffs' Opposition to Motions for Summary Judgment (docket No.
26  **199**) and Defendant ROBERT GARCIA-PEREZ's Reply... (docket No. **202**).